Opinion
 

 MORRISON, J.
 

 The trial court declared plaintiff John E. Wolfgram a vexatious litigant. He failed to post the required security and his action was dismissed. He and a purported coplaintiff, Attorney Kurt M. Simmons, appeal. In the published portion of the opinion we reject certain novel constitutional challenges to the vexatious litigant statute. We shall affirm.
 

 Wolfgram, who styles himself “philosopher and blacklisted attorney,” sued Wells Fargo Bank and others (Wells Fargo), alleging malicious prosecution and seeking to quiet title to certain realty. Wells Fargo moved to declare Wolfgram a vexatious litigant. The motion was supported by evidence tending to show lack of merit in this suit and by copies of court documents which established Wolfgram filed at least five unsuccessful suits against judges and other officials, alleging misdeeds such as election fraud and blacklisting. Wolfgram opposed the motion in part by urging suits against the government were privileged.
 
 [2]
 

 The court (Halpin, J.) granted the motion and ordered Wolfgram to post $15,000 as security, and to obtain permission before filing new lawsuits in
 
 *48
 
 propria persona. Wolfgram did not post security and Wells Fargo moved to dismiss. In response, Wolfgram moved to substitute his present attorney, Simmons, as a plaintiff, claiming that he had transferred the property to Simmons, who wanted to pursue the quiet title cause of action. The court (Perasso, J.) denied the motion to substitute Simmons as a party and dismissed the complaint.
 

 Discussion
 

 I. Introduction
 

 A.
 
 The Impetus for the Vexatious Litigant Statute.
 

 “A problem [was] created by the persistent and obsessive litigant, appearing in pro. per., who has constantly pending a number of groundless actions, sometimes against judges and other court officers who were concerned in the adverse decisions of previous actions.” (Note (1963) 38 State Bar J. 489; see Comment,
 
 The Vexatious Litigant
 
 (1966) 54 Cal.L.Rev. 1769, 1772-1773; accord, Halpin,
 
 Delay on Appeal
 
 (1963) 38 State Bar J. 279.) The Legislature adopted the vexatious litigant statute (Stats. 1963, ch. 1471, § 1, p. 3038), patterned after a statute permitting a court to require security in some derivative suits. (See
 
 Beyerbach
 
 v.
 
 Juno Oil Co.
 
 (1954) 42 Cal.2d 11 [265 P.2d 1].) The idea began with the Los Angeles County Bar Association and was pursued by the State Bar, which argued, “The need for the adoption of this legislation is that there is an unreasonable burden placed upon the courts by groundless litigation, which, in turn, prevents the speedy consideration of deserving and proper litigation; the suits that have been filed against the judges themselves require the full time of three to four Deputy Attorneys General[.]” (Letter to Gov. Brown (July 3, 1963) Gov.’s Ch. Bill File, also citing
 
 Stafford
 
 v.
 
 Russell
 
 (1962) 201 Cal.App.2d 719, 722 [20 Cal.Rptr. 112].)
 

 B.
 
 The Statute.
 

 Code of Civil Procedure section 391 et seq. (further unspecified references are to this code), provides as follows:
 

 “In any litigation pending in any court of this state, ... a defendant,” (§391.1) defined as “a person (including corporation, association, partnership and firm or governmental entity) against whom a litigation is brought or maintained or sought to be brought or maintained” (§ 391, subd. (e)), “may move ... for an order requiring the plaintiff to furnish security . . . upon a showing that... the plaintiff is a vexatious litigant and that there is not a
 
 *49
 
 reasonable probability that he will prevail in the litigation against the moving defendant.” (§ 391.1.) Upon making the requisite findings, the court orders the plaintiff to give security, to compensate for the reasonable costs and attorney fees of defending the suit. (§§391.1, 391.3) Upon failure to post security, the action is dismissed. (§ 391.4.)
 

 The court may enter an order prohibiting the vexatious litigant from filing new state court litigation absent leave of the presiding judge where the litigation is proposed to be filed, referred to as a “prefiling” order. (§ 391.7.) The Judicial Council regularly publishes a list of such persons, to enable court clerks to enforce the statutory restriction. (§ 391.7, subd. (d).) A person subject to a prefiling order may still file state suits in two ways. First, he or she can persuade the presiding judge of the relevant court that “the litigation has merit and has not been filed for the purposes of harassment or delay,” in which case the judge may condition such filing on posting security. Second, he or she can employ an attorney to file an action. (§391.7, subd. (b).) The vexatious litigant who employs an attorney avoids the prefiling requirements but may still have to post security. (See
 
 Camerado Ins. Agency, Inc.
 
 v.
 
 Superior Court
 
 (1993) 12 Cal.App.4th 838 [16 Cal.Rptr.2d 42].)
 

 “ ‘Litigation’ means any civil action or proceeding ... in any state or federal court.” (§ 391, subd. (a).) One type of “vexatious litigant” is a person who in a seven-year period “has commenced, prosecuted, or maintained in propria persona at least five litigations other than in a small claims court that have been (i) finally determined adversely to the person or (ii) unjustifiably permitted to remain pending at least two years[.]” (§ 391, subd. (b)(1).) Others are persons who repeatedly sue on the same cause of action
 
 (id.,
 
 subd. (b)(2)), engage in frivolous tactics
 
 (id.,
 
 subd. (b)(3)), or who have been declared vexatious
 
 (id.,
 
 subd. (b)(4)).
 

 C.
 
 The Contentions.
 

 Under the statute, the underlying suits need only have been “commenced, prosecuted, or maintained in propria persona,” not brought in small claims, and “(i) finally determined adversely to the person or (ii) unjustifiably permitted to remain pending at least two years without having been brought to trial or hearing.” (§ 391, subd. (b)(1).) The rationale is that there is a limit to how many causes of action an individual is likely to accrue. (See
 
 Green
 
 v.
 
 Arnold
 
 (W.D.Tex. 1981) 512 F.Supp. 650, 651.)
 

 Wolfgram urges that an unsuccessful, colorable (i.e., nonfrivolous) action against the government should not “count” as one of the underlying actions supporting a finding of vexatiousness, lest his right to petition the government be infringed. He further contends the requirement that he submit to
 
 *50
 
 a “prefiling order” before commencing future suits is unconstitutional because it is an unlawful “prior restraint” and violates due process.
 

 To the extent Wells Fargo even addresses Wolfgram’s contentions, it relies on cases which have rejected
 
 other
 
 constitutional challenges to the statute. Such mode of argument mirrors the declaration by the Fifth District Court of Appeal that “The vexatious litigant statutes are constitutional.
 
 (In re Whitaker
 
 (1992) 6 Cal.App.4th 54, 56 . . . .)”
 
 (Childs
 
 v.
 
 PaineWebber Incorporated
 
 (1994) 29 Cal.App.4th 982, 993 [35 Cal.Rptr.2d 93].) We are unaware of any doctrine which insulates a statute from one constitutional attack, simply because it has survived a different constitutional attack. Wells Fargo also points to the unremarkable rule that “A state may set the terms on which it will permit litigations in its courts.”
 
 (Cohen
 
 v.
 
 Beneficial Loan Corp.
 
 (1949) 337 U.S. 541, 552 [69 S.Ct. 1221, 1228, 93 L.Ed. 1528, 1539]; see
 
 Taliaferro
 
 v.
 
 Hoogs
 
 (1965) 236 Cal.App.2d 521, 525-526 [46 Cal.Rptr. 147].) The generality quoted is of little utility. No case cited has measured the constitutionality of the statutes against the claims Wolfgram asserts. We do so now.
 

 II. The Right to Petition
 

 To place Wolfgram’s contentions in perspective, we first outline the right of persons to sue, to “petition” for redress of grievances. In California law, there is an unusual distinction drawn between suits between persons and suits against the government. This distinction lends support to Wolfgram’s contention that his suits against the government should not “count.” However, because the “right” to petition was never absolute and because sufficient safeguards are contained within the statute, it does not impermissibly “chill” litigants.
 

 A.
 
 The Common or Natural Law Origin of the Right to Petition.
 

 The right to petition for redress of grievances is the right to complain about and complain to the government. The Magna Carta, chapter 61, purported
 
 to grant
 
 the right. Now it is viewed as a “natural” right (Paterson, Liberty of the Press, Speech, and Public Worship (1880) Right to Petition Parliament, pp. 30-31), was confirmed by parliamentary resolution in 1669 as an inherent right (Corwin, Constitution of the United States (2d ed. 1964) pp. 914-915), and was lodged in the Bill of Rights of 1689. (1 W. & M. sess. 2, ch. 2 [3 Stats, at Large 417] [“. . . it is the right of the subjects to petition the king ... all commitments and prosecutions for such petitioning are illegal”]; see
 
 San Filippo
 
 v.
 
 Bongiovanni
 
 (3d Cir. 1994) 30 F.3d 424, 443, fn. 23, quoting 1 Blackstone, Commentaries 143.) The right embraces dissent,
 
 *51
 
 and “would seem unnecessary to be expressly provided for in a republican government, since it results from the very nature and structure of its institutions. It is impossible that it could be practically denied until the spirit of liberty had wholly disappeared, and the people had become so servile and debased as to be unfit to exercise any of the privileges of freemen.” (Story, Commentaries on the Constitution (1833) § 998, p. 707; see 1 Cooley, Constitutional Limitations (8th ed. 1927) Protections to Personal Liberty, pp. 728, 729, quoting Lieber, Liberty and Self-Government (2d ed. 1859) p. 124 [“deprivation of it would at once be felt by every freeman as a degradation. The right of petitioning is indeed a necessary consequence of the right of free speech and deliberation,—a simple, primitive, and natural right.”].)
 
 [3]
 

 The right of petition was never absolute. “Yet the form of a petition to the king must not be allowed to cloke a scandalous censure of a judge or court as was the case of Wrenham, who slandered Lord Chancellor Bacon for making a decree against him.” (Paterson, Liberty of the Press, Speech, and Public Worship,
 
 supra,
 
 p. 33, fn. 3; see Wrenham’s Case, 80 Eng.Rep. [Hobart 220], p. 367 [Star Chamber fined Wrenham £1,000].) Statutes limited the number of petitioners, to prevent “pretended Grievances . . . made use of to serve the Ends of factious and seditious Persons[.]” (See 4 Blackstone, Commentaries 147-148 and 1 Blackstone, Commentaries,
 
 supra,
 
 p. 143, discussing 13 Charles II [St. 1] ch. 5 [3 Stats, at Large 189].) Other ways of curbing abusive litigants were tried.
 
 [4]
 

 B.
 
 The Constitutional Right to Petition.
 

 The First Amendment to the United States Constitution provides in part: “Congress shall make no law . . . abridging ... the right of the people peaceably to assemble, and to petition the government for a redress
 
 *52
 
 of grievances.” Despite the explicit reference to “Congress,” the First Amendment, including specifically the right to petition, is “incorporated” against the states by virtue of the Fourteenth Amendment.
 
 (Hague
 
 v.
 
 C.I.O.
 
 (1939) 307 U.S. 496, 512-513 [59 S.Ct. 954, 963, 83 L.Ed. 1423, 1435].) Cases construing the California analog frequently rely on federal court interpretations of the First Amendment.
 

 The original California petition clause spoke only of the right “to petition
 
 the legislature
 
 for redress of grievances.” (Cal. Const, of 1849, art. I, § 1, Cal. Const, of 1879, art. I, § 10, italics added.) In 1974 the petition clause was redrafted to read: “The people have the right to instruct their representatives, petition
 
 government
 
 for redress of grievances, and assemble freely to consult for the common good.” (Cal. Const., art. I, § 3, italics added.) It appears this redrafting codified existing law. As Governor Pat Brown—who would later sign the vexatious litigant statute—had argued, the original state petition clause “comprehends the entire spectrum of government and not merely the legislature.” (Brown,
 
 The Right to Petition: Political or Legal Freedom?
 
 (1961) 8 UCLA L.Rev. 729, 732, fn. omitted; see Ballot Pamp., Proposed Amends, to Cal. Const., Gen. Elec. (Nov. 5, 1974), analysis by Legis. Analyst, p. 26 & argument in favor of Prop. 7, p. 28 [no substantive change]; but see Cal. Const. Revision Com., Proposed Revision (1971) art. 1, § 12, pt. 5, p. 23 [clause “broadened”].)
 

 The state right to petition has been called “an essential attribute of governing . . . vital to a basic process in the state’s constitutional scheme— direct initiation of change by the citizenry through initiative, referendum, and recall.”
 
 (Robins
 
 v.
 
 Pruneyard Shopping Center
 
 (1979) 23 Cal.3d 899, 907-908 [153 Cal.Rptr. 854, 592 P.2d 341], citations omitted, affd.
 
 sub nom. PruneYard Shopping Center
 
 v.
 
 Robins
 
 (1980) 447 U.S. 74 [100 S.Ct. 2035, 64 L.Ed.2d 741]; accord,
 
 United States
 
 v.
 
 Cruikshank
 
 (1876) 92 U.S. 542, 552 [23 L.Ed. 588, 591] [“The very idea of a government, republican in form, implies a right on the part of its citizens to meet peaceably for consultation in respect to public affairs
 
 and to petition for a redress of
 
 grievances”]; see
 
 Hague
 
 v.
 
 C.I.O., supra,
 
 307 U.S. at pp. 513, 522 [59 S.Ct. at pp. 962-963, 967, 83 L.Ed. at pp. 1435, 1440];
 
 Greene
 
 v.
 
 Hawaiian Dredging Co.
 
 (1945) 26 Cal.2d 245, 251 [157 P.2d 367] [right to petition employer implied from “right of the governed to petition those exercising the powers of government”].) Although
 
 Robins
 
 spoke of reform via legislation and recall, litigation, too, may initiate change. The right to petition encompasses the right to sue.
 
 (California Transport
 
 v.
 
 Trucking Unlimited (1972)
 
 404 U.S. 508, 510 [92 S.Ct. 609, 611-612, 30 L.Ed.2d 642,
 
 *53
 
 646] .)
 
 [5]
 
 “The right to sue and defend in the courts is the alternative of force. In an organized society it is the right conservative of all other rights, and lies at the foundation of orderly government.”
 
 (Chambers
 
 v.
 
 Baltimore & O. R. Co.
 
 (1907) 207 U.S. 142, 148 [28 S.Ct. 34, 35, 52 L.Ed. 143, 146].) “[L]itigation may well be the sole practicable avenue open to a minority to petition for redress of grievances.”
 
 (N. A. A. C. P.
 
 v.
 
 Button
 
 (1963) 371 U.S. 415, 430 [83 S.Ct. 328, 336, 9 L.Ed.2d 405, 416].)
 

 In
 
 City of Long Beach
 
 v.
 
 Bozek
 
 (1982) 31 Cal.3d 527 [183 Cal.Rptr. 86, 645 P.2d 137], judgment vacated and cause remanded (1983) 459 U.S. 1095 [103 S.Ct. 712, 74 L.Ed.2d 943] reiterated (1983) 33 Cal.3d 727, 728 [190 Cal.Rptr. 918, 661 P.2d 1072]
 
 (Bozek),
 
 the California Supreme Court concluded that a suit by a subject against the government occupies a preferred status over a suit invoking the judicial power of government against another subject. The court held that a government entity could not bring a malicious prosecution action in response to a meritless suit, and that “existing remedies are adequate to protect the interests of municipalities in obtaining compensation for the expenses incurred in defending against unwarranted lawsuits and in deterring improper suits in the future. Additionally, the maintenance of malicious prosecution actions by governmental entities would generate a potentially chilling effect of considerable dimension upon the exercise of the right to petition the government through the courts for redress of grievances.”
 
 [6]
 
 (B
 
 ozek, supra,
 
 31 Cal.3d at p. 530.)
 

 Among the “existing remedies” which
 
 Bozek
 
 stated reduce the impact of “unwarranted” and “improper” litigation are sanctions under section 128.5 and a peace officer’s ability to obtain reasonable fees for bad faith actions under section 1021.7.
 
 (Bozek, supra,
 
 31 Cal.3d at p. 537.) “In order to avoid the chilling effect upon the constitutional right of petition which would result if we were to allow municipalities to maintain actions for malicious prosecution, we conclude the best course is to defer to the legislatively provided remedy. An award of the expenses of suit by a trial court in an initial action will fully compensate a municipality for its expenses of defending suit. The availability of such an award, in combination with the criminal
 
 *54
 
 sanctions provided in Penal Code section 72 for the filing of false claims with the government and the possibility of malicious prosecution actions by individual city employees—here the police officers—provide an adequate deterrent to unwarranted lawsuits without unduly infringing upon the right of petition.”
 
 (Id.
 
 at p. 538, fn. omitted.)
 

 Bozek
 
 has been followed in several cases raising similar concerns about “chilling” a litigant’s petition rights.
 
 (Pacific Gas & Electric Co.
 
 v.
 
 Bear Stearns & Co.
 
 (1990) 50 Cal.3d 1118, 1123 [270 Cal.Rptr. 1, 791 P.2d 587] [barring causes of action for interference with contractual relations and prospective advantage, where “interference” consists of inducing a party to seek a judicial interpretation of the contract];
 
 Oren Royal Oaks Venture
 
 v.
 
 Greenberg, Bernhard, Weiss & Karma, Inc.
 
 (1986) 42 Cal.3d 1157 [232 Cal.Rptr. 567, 728 P.2d 1202] [tort of abuse of process does not encompass the mere filing or maintaining of a lawsuit];
 
 Smith
 
 v.
 
 Silvey
 
 (1983) 149 Cal.App.3d 400 [197 Cal.Rptr. 15] [injunction prohibiting complaints to public agencies dissolved].) “ ‘[T]he principle of constitutional law that bars litigation arising from injuries received as a consequence of First Amendment petitioning activity [should be applied], regardless of the underlying cause of action asserted by the plaintiffs.’ . . .”
 
 (Hi-Top Steel Corp.
 
 v.
 
 Lehrer
 
 (1994) 24 Cal.App.4th 570, 578 [29 CaI.Rptr.2d 646], citations omitted.)
 

 Notwithstanding the protected nature of the right to sue,
 
 some
 
 suits may be undertaken with hostile intent and disguised as petitions for redress: “[I]m-posing liability for [such] actions does not interfere with [the] state constitutional ‘right to . . . petition government for redress of grievances’ ” because the actions were not taken in exercise of such right.
 
 (Hi-Top Steel Corp.
 
 v.
 
 Lehrer, supra,
 
 24 Cal.App.4th at pp. 578-579, see
 
 Blank
 
 v.
 
 Kirwan
 
 (1985) 39 Cal.3d 311, 321-322 [216 Cal.Rptr. 718, 703 P.2d 58].)
 

 This problem, as discussed in several California cases, is illuminated by cases discussing a peculiar issue arising in antitrust law: When can the filing of a lawsuit lead to antitrust liability? There is an established standard under federal law that the filing of a lawsuit is protected unless the suit is a “sham” designed to harm competitors. (See
 
 Hi-Top Steel Corp.
 
 v.
 
 Lehrer, supra,
 
 24 Cal.App.4th at pp. 574-583.) Such determination embraces the impropriety of the motive and “objective” baselessness of the action. Under federal law, absent “a patent lack of merit, an action protected under the First Amendment by the right of petition cannot be the basis for litigation. [Citation.]”
 
 (Ludwig
 
 v.
 
 Superior Court
 
 (1995) 37 Cal.App.4th 8, 22 [43 Cal.Rptr.2d 350].)
 

 Ludwig,
 
 a “SLAPP-suit” dismissal case, cited
 
 Professional Real Estate Investors, Inc.
 
 v.
 
 Columbia Pictures Industries, Inc.
 
 (1993) 508 U.S. 49, 60
 
 *55
 
 [113 S.Ct. 1920,1928,123 L.Ed.2d 611, 623-624] which refined the
 
 “NoerrPennington”
 
 antitrust immunity doctrine and the “sham exception” thereto. “Sham” suits enjoy no constitutional immunity. (See
 
 McDonald
 
 v.
 
 Smith
 
 (1985) 472 U.S. 479, 484 [105 S.Ct. 2787, 2790-2791, 86 L.Ed.2d 384, 389] [libel case].)
 
 Real Estate Investors
 
 clarified earlier cases and set out a two-part test for “shamness”: In order for a suit to qualify as “sham” for antitrust purposes, “First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. . . . Only if challenged litigation is objectively meritless may a court examine the litigant’s subjective motivation. Under this second part of our definition of sham, the court should focus on whether the baseless lawsuit conceals ‘an attempt to interfere
 
 directly
 
 with the business relationships of a competitor,’ . . . through the ‘use [of] the governmental
 
 process
 
 —as opposed to the
 
 outcome
 
 of that process—as an anticompetitive weapon.’ .. . .”
 
 (Professional Real Estate Investors, Inc.
 
 v.
 
 Columbia Pictures Industries, Inc., supra,
 
 508 U.S. at pp. 60-61 [113 S.Ct. at p. 1928, 123 L.Ed.2d at p. 624], citations and fn. omitted; see
 
 Hi-Top Steel Corp.
 
 v.
 
 Lehrer, supra,
 
 24 Cal.App.4th at pp. 577-578.)
 

 With this overview of the law regarding petition rights, we now turn to Wolfgram’s contentions.
 

 C.
 
 The Right to Petition and the Vexatious Litigant Statute.
 

 The cases extending
 
 Bozek, supra,
 
 31 Cal.App.3d 527 in California do not elaborate on Bozek’s elevation of petitions
 
 against the government
 
 to a place of special status. As stated, we are constrained to accept that that is the law in California. (See fn. 6,
 
 ante.)
 
 Wolfgram extracts from
 
 Bozek
 
 and the “sham” line of cases the rule that any liability predicated on the proper (i.e., nonfrivolous) exercise of the right to petition against the government is forbidden. If and only if a petition against the government meets the standards of a “sham” or frivolous suit can any penalty be exacted. Wolf-gram then likens the vexatious litigant declaration to such a penalty. Since the underlying lawsuits need not themselves be frivolous, even if brought against the government, there is an impermissible “chill.”
 
 [7]
 
 We disagree.
 

 “We start with the premise that the rights to assemble peaceably and to petition for a redress of grievances are among the most precious of the liberties safeguarded by the Bill of Rights. These rights, moreover, are intimately connected, both in origin and in purpose, with the other First
 
 *56
 
 Amendment rights of free speech and free press. ‘All these, though not identical, are inseparable.’ . . . The First Amendment would, however, be a hollow promise if it left government free to destroy or erode its guarantees by indirect restraints so long as no law is passed that prohibits free speech, press, petition, or assembly as such. We have therefore repeatedly held that
 
 laws which actually affect the exercise of these vital rights cannot be sustained merely because they were enacted for the purpose of dealing with some evil within the State’s legislative competence, or even because the laws do in fact provide a helpful means of dealing with such an evil." (Mine Workers
 
 v.
 
 Illinois Bar Assn.
 
 (1967) 389 U.S. 217, 222 [88 S.Ct. 353, 356, 19 L.Ed.2d 426, 430], citations omitted, italics added; see
 
 American Civil Liberties Union
 
 v.
 
 Board of Education
 
 (1961) 55 Cal.2d 167, 178 [10 Cal.Rptr. 647, 359 P.2d 45, 94 A.L.R.2d 1259].) While these rights are not limited to “political matters,” (see
 
 Mine Workers, supra,
 
 389 U.S. at p. 223 [88 S.Ct. at pp. 356-357, 19 L.Ed.2d at p. 431];
 
 Thomas
 
 v.
 
 Collins
 
 (1945) 323 U.S. 516, 531 [65 S.Ct. 315, 323-324, 89 L.Ed. 430, 440-441];
 
 City and County of San Francisco
 
 v.
 
 Small Claims Court
 
 (1983) 141 Cal.App.3d 470, 477 [190 Cal.Rptr. 340]), the First Amendment attains its highest potency in cases, such as Wolfgram’s, which manifest
 
 political
 
 expression. (See
 
 44 Liquor-mart, Inc.
 
 v.
 
 Rhode Island
 
 (1996) 517 U.S. _, _ [116 S.Ct. 1495, 1500, 134 L.Ed.2d 711, 736] (cone. opn. of Scalia, J.) [“core offense of suppressing particular political ideas”];
 
 Garrison
 
 v.
 
 Louisiana
 
 (1964) 379 U.S. 64, 77-78 [85 S.Ct. 209, 217, 13 L.Ed.2d 125, 134-135] [protected nature of criticisms about judges]; Kozinski & Banner,
 
 The Anti-History and Pre-History of Commercial Speech
 
 (1993) 71 Tex. L.Rev. 747, 751-752.)
 

 But, as demonstrated, the right to petition has never been absolute. For example, we upheld a conviction for “peaceable, nonobstructive picketing within the interior of the state Capitol building.”
 
 (Simpson
 
 v.
 
 Municipal Court
 
 (1971) 14 Cal.App.3d 591, 594 [92 Cal.Rptr. 417].) We recognized that the ultimate purpose of the Capitol was to facilitate political views, and that “the building’s primary use requires assurances of free discussion and openness to petition,” but we upheld the conviction, pointing out the narrowness of the ban, and that “the patrols would tend to chill and repress the views of others.”
 
 (Id.
 
 at pp. 597, 598; see Paterson, Liberty of the Press, Speech, and Public Worship,
 
 supra,
 
 at pp. 34-35 and especially fn. 2 [petitioners swarmed into Commons; ensuing riot resulted in many deaths].) Similarly, the general right of persons to file lawsuits—even suits against the government—does not confer the right to clog the court system and impair everyone else’s right to seek justice. As has been pointed out: “The constant suer for himself becomes a serious problem to others than the defendant he dogs. By clogging court calendars, he causes real detriment to those who have legitimate controversies to be determined and to the taxpayers who
 
 *57
 
 must provide the courts.”
 
 (Taliaferro
 
 v.
 
 Hoogs
 
 (1965) 237 Cal.App.2d 73, 74 [46 Cal.Rptr. 643].)
 

 Wolfgram makes much of the quintessential form of “petition” against the government, the petition for a writ of habeas corpus. Although the “Great Writ” has its own constitutional font (U.S. Const., art. I, § 9, cl. 2; Cal. Const., art. I, § 11), it certainly has no
 
 less
 
 protection under the First Amendment for such reason. Yet even this “right to petition” is subject to abuse and, hence, to reasonable restrictions. (See
 
 Felker
 
 v.
 
 Turpin
 
 (1996) 518 U.S. _ [116 S.Ct. 2333, 135 L.Ed.2d 827];
 
 Johnson
 
 v.
 
 Avery
 
 (1969) 393 U.S. 483, 491 [89 S.Ct. 747, 751-752, 21 L.Ed.2d 718, 724].)
 
 [8]
 

 We agree with Wolfgram that the authorities canvassed teach that any impairment of the right to petition, including any penalty exacted after the fact, must be narrowly drawn. But here there is no direct “penalty” exacted as a result of Wolfgram’s five losing suits. Instead, they inform us that the suer has repeatedly lost many meritless (albeit colorable) suits while acting in propria persona, which, when combined with the fact that he has filed another (sixth) suit which has been found to lack merit, support the reasonable inference that the suer has been using the court system, inappropriately and will continue to do so.
 

 Wolfgram suggests that an impermissible “chill” occurs because a person who had lost several suits against the government might fear bringing yet another suit, for fear of being branded a vexatious litigant. That would occur if and only if the last suit lacked merit, that “. . . plaintiff’s recovery is foreclosed as a matter of law or that there are insufficient facts to support recovery by the plaintiff on its legal theories, even if all the plaintiff’s facts are credited.”
 
 (Devereaux
 
 v.
 
 Latham & Watkins, supra,
 
 32 Cal.App.4th at pp. 1582-1583.)
 
 [9]
 
 Such a suit is by definition not worthy and under settled rules of practice would ordinarily be disposed of by means of a demurrer, judgment on the pleadings, or summary judgment. “[B]aseless litigation is not
 
 *58
 
 immunized by the First Amendment right to petition.”
 
 (Bill Johnson’s Restaurants, Inc.
 
 v.
 
 NLRB
 
 (1983) 461 U.S. 731, 743 [103 S.Ct. 2161, 2170, 76 L.Ed.2d 277, 289].)
 

 The fact that the statute does not include a requirement that the five
 
 losing
 
 suits be frivolous does not render it unconstitutional. Wolfgram states that “Merely losing five suits in seven years is not ‘flagrant abuse’ of the system,” in other words, that the inference drawn by the statute is unreasonable. But he overlooks the fact that that showing is insufficient to support a motion to declare someone a vexatious litigant, it must be coupled with proof that the suer has come into court again, with a suit with no reasonable probability of success. (§ 391.1.) That fact, coupled with the abysmal history of failure, is sufficient to establish “vexatiousness” in the ultimate sense, litigation lacking “reasonable or probable cause or excuse.” (Black’s Law Diet. (6th ed. 1990) p. 1565, col. 2.) “It is not unreasonable ... to classify separately from other litigants those litigants with a prior history of litigiousness when they bring an action with no reasonable probability to prevail. Such a litigant is more likely to abuse the processes of the courts and to harass the adverse party than other litigants.” (Comment,
 
 The Vexatious Litigant, supra,
 
 54 Cal.L.Rev. at p. 1778.)
 

 As a matter of common experience even many meritorious suits fail, due to the vagaries of the trial process if nothing else. Many more colorable suits fail, either due to pretrial disposition or failure to persuade the trier of fact. Yet, loss of
 
 five
 
 suits in but seven years is remarkable. Most people never sue anybody. While that does not lessen any person’s right to sue to correct real or perceived injustices, it does suggest that the inference to be drawn from the statute is, despite Wolfgram’s contrary view, relatively narrow: Only those citizens who decline to hire lawyers, lose five suits in seven years, then undertake a sixth suit which lacks merit, will be labeled vexatious.
 

 Finally, it is true no citizen is required to hire a lawyer. Our mention of the “pro per” requirement of the statute does not derive from any conspiracy to silence dissent, as Wolfgram posits. Instead, it reflects the reality that a lawyer is often the best judge of the merits of a proposed suit. Of course, some attorneys allow themselves to be used as puppets by their clients, but such abuse can be remedied. The vexatious litigant can be barred from court, even if he uses a “strawman” attorney. (See
 
 In re Shieh
 
 (1993) 17 Cal.App.4th 1154, 1167 [21 Cal.Rptr.2d 886] [“Shieh does not engage
 
 *59
 
 attorneys as neutral assessors of his claims, bound by ethical considerations not to pursue unmeritorious or frivolous matters on behalf of a prospective client. [Citation.] Rather, these attorneys who ostensibly ‘represent’ Shieh serve as mere puppets”].) And the attorney who effectively lends his license to another is simply asking for trouble. These facts demonstrate the soundness of the Legislature’s distinction between in propria persona suits and suits filed by attorneys.
 
 (Taliaferro
 
 v.
 
 Hoogs, supra, 236
 
 Cal.App.2d at p. 527 [“Attorneys are governed by prescribed rules of ethics and professional conduct, and, as officers of the court, are subject to disbarment, suspension, and other disciplinary sanctions not applicable to litigants in propria persona”].)
 
 [10]
 

 In sum, the vexatious litigant statute does not impermissibly “chill” the right to petition and does not “penalize” the filing of unsuccessful, colorable suits.
 

 III. Prefiling Orders
 

 Wolfgram contends the “prefiling” order constitutes an unlawful prior restraint on his right to petition and violates due process. We disagree.
 

 A.
 
 Prior Restraint.
 

 Wolfgram relies on
 
 Smith
 
 v.
 
 Silvey, supra,
 
 149 Cal.App.3d 400, which invalidated an injunction prohibiting Silvey from contacting public agencies with complaints. The court held such injunction violated his right to petition the government and constituted a “prior restraint,” invalid under the First Amendment without a showing of a “clear and present danger.” (Pp. 406-407.) But in that and other “prior restraint” cases, content discrimination is present.
 
 (Danskin
 
 v.
 
 San Diego Unified Sch. Dist.
 
 (1946) 28 Cal.2d 536, 545-548, 554 [171 P.2d 885] [applicant for use of auditorium cannot be required to swear lack of affiliation with given group],
 
 id.
 
 at pp. 556-557 (conc. opn. of Carter, J.);
 
 New York Times Co.
 
 v.
 
 United States
 
 (1971) 403 U.S. 713 [91 S. Ct. 2140, 29 L.Ed.2d 822] [newspaper cannot be barred from publishing Pentagon Papers],
 
 Thomas
 
 v.
 
 Collins, supra, 323
 
 U.S. 516 [union organizer cannot be enjoined from speaking without a license];
 
 Bridges
 
 v.
 
 California
 
 (1941) 314 U.S. 252 [62 S.Ct. 190, 86 L.Ed. 192, 159 A.L.R. 1346] [vacating contempt consisting of comments about pending litigation];
 
 Near
 
 v.
 
 Minnesota
 
 (1931) 283 U.S. 697, 713-723 [51 S.Ct. 625, 630-633, 75 L.Ed. 1357, 1366-1371] [newspaper cannot be enjoined from defamation
 
 *60
 
 (criticism of official conduct), but during war “government might prevent actual obstruction to its recruiting service or the publication of the sailing dates of transports or the number and location of troops”];
 
 Schenck
 
 v.
 
 United States
 
 (1919) 249 U.S. 47, 50-53 [39 S.Ct. 247, 248-249, 63 L.Ed. 470, 473-474].)
 

 This line of cases involves government censorship. A vexatious litigant is not the subject of content discrimination. Wolfgram’s assumption that judges (reviewing proposed filings) or attorneys employed by a litigant to bypass the prefiling order (as officers of the court), may perpetrate censorship as organs of the judiciary or of the government generally is unfounded. We presume attorneys and judges obey all laws, particularly the state and federal Constitutions, which they are sworn to uphold. (Evid. Code, § 664 [presumption that official duty “regularly performed”]; Civ. Code, § 3548 [“law has been obeyed”].)
 

 The prefiling order component of the vexatious litigant statute is a necessary method of curbing those for whom litigation has become a game. Wolfgram has not established that a partial restriction on the ability to file suit has ever been held to be a “prior restraint” requiring a showing of clear and present danger and concomitant procedural safeguards. (See Tribe, American Constitutional Law (2d ed. 1988) §§ 12.34-12.36, pp. 1039-1054.) To the extent it keeps vexatious litigants from clogging courts, it is closer to “licensing or permit systems which are administered pursuant to narrowly drawn, reasonable and definite standards” which represent “government’s only practical means of managing competing uses of public facilities[.]”
 
 (Id.
 
 at p. 1051.) When a vexatious litigant knocks on the courthouse door with a colorable claim, he may enter.
 

 B.
 
 Due Process.
 

 To the extent Wolfgram complains that the “prefiling” statute violates due process, we disagree: The vexatious litigant has the right to petition the presiding judge of any court for permission to file any litigation he chooses, or to employ an attorney to file suit. (§ 391.7, subd. (a).)
 

 Wolfgram argues the “prefiling” statute is overbroad because it prevents the filing of writs of habeas corpus and petitions for dissolution of marriage, resolution of paternity and adoption. We disagree. First, if a vexatious litigant chooses to file an action implicating family rights, which Wolfgram properly characterizes as subject to particular constitutional protections, the presiding judge of the proposed court presumably will take the nature of the action into consideration. For example, a declaration by the litigant that he is
 
 *61
 
 presently married and desires a divorce would, in all likelihood, constitute good cause to allow him to file a dissolution petition; the minimal delay and effort in drafting the request for permission to file the action would not be an unreasonable hurdle. Similarly, Wolfgram’s claims regarding writs of habeas corpus, a type of litigation we have acknowledged merits unique constitutional protection, fail, because we presume a presiding judge would consider the special nature of the Great Writ in deciding whether to allow the filing of a petition therefor. A preliminary declaration by the litigant that he is in actual or constructive custody, and entitled to release or other relief based on some legal theory, can hardly be burdensome, since such allegations must appear in the petition in any event. (Pen. Code, § 1474 [“petition must also state in what the alleged illegality consists”]. See Fischer et al., Appeals and Writs in Criminal Cases (Cont.Ed.Bar 1982) Writs in California State Courts, §§ 2.93-2.96, pp. 278-281; see also Judicial Council Forms Manual (Bancroft-Whitney 1994) Forms MC-270, MC-275, pp. 677, 683 [requiring specification of grounds for relief].) A prefiling order does not constitute a suspension of the writ of habeas corpus as proscribed by the state and federal Constitutions. (U.S. Const., art. I, §9, cl. 2; Cal. Const., art. L, § 11, see
 
 Felker
 
 v.
 
 Turpin, supra,
 
 518 U.S. at p._ [116 L.Ed.2d at pp. 2341-2342, 135 L.Ed.2d at p. 840.)
 

 Moreover, as to all categories of cases, if a presiding judge refused to exercise or abused his or her discretion, the aggrieved litigant could file an original mandamus action in a higher court to compel the presiding judge to act according to law. (Cal. Const., art. VI, § 10; Code Civ. Proc., § 1085;
 
 State Farm etc. Ins. Co.
 
 v.
 
 Superior Court
 
 (1956) 47 Cal.2d 428, 432 [304 P.2d 13]; cf.
 
 Marble
 
 v.
 
 Latchford Glass Co.
 
 (1962) 205 Cal.App.2d 171, 175-176 [22 Cal.Rptr. 789].) In a case involving a claim by a litigant that a trial court erroneously refused to allow him to file an independent suit against a receiver, but required him to intervene in the receivership matter, the California Supreme Court held “It must, of course, be conceded that if upon the showing made upon the application for leave to sue, no discretion was left to respondent [Judge Coffey] but to grant the petition, then petitioner is entitled to the issuance of this writ of mandate to compel respondent to act as the law required him to do,” i.e., grant leave to sue.
 
 (De Forrest
 
 v.
 
 Coffey
 
 (1908) 154 Cal. 444, 448 [98 P. 27]; see
 
 Vitug
 
 v.
 
 Griffin
 
 (1989) 214 Cal.App.3d 488, 492-493 [262 Cal.Rptr. 588].) The same would apply to a vexatious litigant who has demonstrated “the litigation has merit and has not been filed for the purposes of harassment or delay” (§ 391.7, subd. (b)), but who has been denied leave to proceed with the suit.
 
 [11]
 

 
 *62
 
 IV., V.
 
 *
 

 Disposition
 

 The judgment is affirmed.
 

 Sparks, Acting P. J., and Nicholson, J., concurred.
 

 A petition for a rehearing was denied March 27, 1997, and appellants’ petition for review by the Supreme Court was denied May 28, 1997. Baxter, J., did not participate therein.
 

 [2]
 

 Wells Fargo relied on two other pleadings. One was an application to file a petition without paying fees, which was denied, but it appears the petition was filed. The other matter appears to be a motion denied for lack of a pending case. Both of these “suits,” if these filings can be so characterized, were against government officials. Wells Fargo also included a copy of a State Bar Court decision. Because Wolfgram was the
 
 respondent
 
 in that case its inclusion in the motion appears to be an
 
 ad hominem
 
 attack against him.
 

 Wolfgram heads no claim regarding the probable lack of merit in this suit. (Cal. Rules of Court, rule 15(a);
 
 Opdyk
 
 v.
 
 California Horse Racing Bd.
 
 (1995) 34 Cal.App.4th 1826, 1831, fn. 4 [41 Cal.Rptr.2d 263].) Accordingly, we presume, in support of the lower court’s findings, that the instant suit lacks merit and, that “plaintiff’s recovery is foreclosed as a matter of law or that there are insufficient facts to support recovery by the plaintiff on its legal theories, even if all the plaintiff’s facts are credited.”
 
 (Devereaux
 
 v.
 
 Latham & Watkins
 
 (1995) 32 Cal.App.4th 1571, 1582-1583 [38 Cal.Rptr.2d 849].)
 

 [3]
 

 The “right to petition” is distinct from the “petition of right,” permitting claims against the Crown. (See Clode, Petition of Right (1887) pp. 1-23; Wade & Bradley, Constitutional Law (1965) Proceedings Against the Crown, pp. 684-685; Chitty, Prerogatives of the Crown (1820) Petition of Right, pp. 340-352.)
 

 [4]
 

 In the
 
 Green
 
 case the court pointed out an earlier method of control, viz., chaining a mischief maker to a rock with a poisonous snake suspended above, dripping poison upon him, but conceded “That case arose prior to the Eighth Amendment.”
 
 (Green
 
 v.
 
 Arnold supra,
 
 512 F.Supp. at p. 652, fn. 11.)
 

 The Chancellor of England once punished an abusive pleader by ordering “that the Warden of the Fleet. . . shall bring him into Westminster Hall. . . and then and there shall cut a hole in the
 
 myddest
 
 of the [pleading] and put the said Richard’s head through the same hole, [and] shall lead the same Richard, bare headed and bare faced, round about Westminster Hall, whilst the Courts are sitting, and shall shew him at the bar of every of the three Courts within the Hall, and shall. . . keep him prisoner, until he shall have paid 10l. to Her Majesty for a fine, and 20 nobles to the defendant, for his costs in respect of the aforesaid abuse[.]”
 
 (Mylward
 
 v.
 
 Weldon
 
 (Feb. 15, 1596); Registrar’s Book A. 1596, fo. 675, reprinted in Monro,
 
 Acta Cancellariae
 
 (1847) pp. 692-693.)
 

 [5]
 

 Blackstone distinguished the right of redress in the courts from the right to petition king or parliament. (1 Blackstone, Commentaries,
 
 supra,
 
 141-143.) The former invokes the
 
 judicial
 
 power of government to redress a wrong committed by another, the latter is a prayer to redress a wrong committed
 
 by the government.
 

 [6]
 

 The dissent correctly pointed out that the right to petition encompasses the right to file a private lawsuit, by which one litigant prays for the exercise of judicial power against another.
 
 (Bozek, supra,
 
 31 Cal.3d at pp. 539-540 (dis. opn. of Kaus, J.).) The dissent persuasively reasoned from this point that the result in
 
 Bozek
 
 is incorrect. However, we are not at liberty to reconsider the issue.
 
 (Auto Equity Sales, Inc.
 
 v.
 
 Superior Court
 
 (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].)
 

 [7]
 

 Although all were meritless, we presume that Wolfgram’s prior suits are not frivolous or “sham” as defined in the text. (See
 
 Bach
 
 v.
 
 McNelis
 
 (1989) 207 Cal.App.3d 852, 875 [255 Cal.Rptr. 232].) We further presume the instant suit lacks merit. (Fn. 2, par. 2,
 
 ante.)
 

 [8]
 

 The Antiterrorism and Effective Death Penalty Act of 1996 bars a second (“successive”) habeas corpus application repeating a claim made in an earlier application and bars an application raising a new claim unless the applicant seeks relief based on a retroactive change in the law, or new facts not previously discoverable which would demonstrate a claim of constitutional error of sufficient magnitude to undermine the result at trial. A person seeking to file such an application in federal district court must obtain permission from a federal court of appeals. If, as Wolfgram maintains, there can be no limitation on the exercise of the right to petition against the government, this so-called “gatekeeper” provision would violate the First Amendment. Yet,
 
 Felker
 
 upholds the statutory “gatekeeper” mechanism. (518 U.S. at p. _[116 S.Ct. at p. 2341, 135 L.Ed.2d at p. 838].) Although the First Amendment was not mentioned in that case, it is unlikely that, if the petition clause means what Wolfgram claims it means, the court would miss the issue.
 

 [9]
 

 Language in
 
 Muller
 
 v.
 
 Tanner
 
 (1969) 2 Cal.App.3d 445, 453 [82 Cal.Rptr. 738] that “It may be assumed that the trial court will recognize that success breeds success when it is
 
 *58
 
 proper to do so” does not mean a trial court has discretion to review the soundness of the underlying suits, only that the trial court does consider the merits of the suit in which the litigant is claimed to be vexatious.
 

 [10]
 

 Wolfgram’s suggestion that the statute thus discriminates against those who are unable to afford to hire a lawyer was not headed as an argument in the opening brief and is unaccompanied by analysis or authority.
 

 [11]
 

 In order to file the mandamus petition attacking the lower court’s refusal to file the complaint or petition the litigant must either employ counsel or seek from the presiding
 
 *62
 
 justice of the appellate court permission to file an original mandamus action. The litigant who proceeds in propria persona must persuade the appellate court’s presiding justice that the mandamus action “has merit and has not been filed for the purposes of harassment or delay.” (§ 391.7, subd. (b).) Whether or not counsel is employed, security may be required. (See p. 49,
 
 supra.)
 

 Wolfgram also states the statutory scheme “sets up a form of ‘attainder’ whereby appellant is deprived of his civil rights
 
 in perpetuum,"
 
 but, for lack of argument heading or analysis, the point is waived.
 

 *
 

 See footnote 1,
 
 ante,
 
 page 43.